UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT SCOTT MURRAY,<br><br>Defendant | Criminal No. 24cr10160<br><br>Violation:<br><br>Count One:<br>Securities Fraud<br>(15 U.S.C. §§ 78j(b) and 78ff(a);<br>17 C.F.R. § 240.10b-5)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and<br>28 U.S.C. § 2461(c)) |

INFORMATION

At all times relevant to this Information:

General Allegations

1. The defendant, ROBERT SCOTT MURRAY ("MURRAY"), was a resident of Massachusetts.

2. Individual 1 was a resident of Massachusetts who knew MURRAY socially.

3. Trillium Capital LLC ("Trillium") was a purported "venture investment company" located in Massachusetts. MURRAY was Trillium's sole owner and manager.

4. Getty Images Holdings, Inc. ("Getty") was a visual media company and supplier of images, videos and music, headquartered in Seattle, Washington. Getty's stock was publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol GETY.

Overview of the Scheme to Defraud

5. In or about April 2023, MURRAY made false and misleading statements—including online, through press releases and in media interviews—with the purpose of artificially inflating the trading price of GETY so that MURRAY could sell the GETY shares he owned at

the artificially inflated price. Thereafter, MURRAY sought to cover up the scheme and to obstruct the investigation into his conduct by instructing Individual 1 to destroy evidence and by making false statements to investigators.

### The Scheme to Defraud

*MURRAY's Efforts to Influence Getty's Strategic Direction*

6. MURRAY was a long-time investor and previously served as the Chief Executive Officer of multiple public companies, including Stream Global Services and 3Com.

7. Between on or about October 5, 2022 and on or about April 5, 2023, MURRAY purchased approximately 300,000 GETY shares.

8. On or about April 5, 2023, MURRAY sent a text message to Individual 1 stating, "Buy gETY" and "Lots of it." Individual 1 thereafter purchased tens of thousands of GETY shares.

9. On or about April 11, 2023, MURRAY caused a press release to be published in the name of Trillium proposing "several opportunities" for Getty to "unlock substantial incremental Enterprise Value."

10. On or about that same day, MURRAY sent an email to Getty's investor relations department on behalf of Trillium in which he contended, "We own over 300,000 shares of GETY" and proposed that Getty "engage a nationally recognized investment bank to evaluate the company's strategic alternative."

11. On or about April 12, 2023, Getty's investor relations department responded to MURRAY's email of the prior day by informing MURRAY that his request and proposals were "deficient" and would not be acted upon.

12. Later that same day, MURRAY sent an email to Getty's investor relations department requesting that Getty "put forward my name for election to the Getty Images Holding, Inc Board of Directors."

13. On or about April 13, 2023, Getty's investor relations department responded to MURRAY's email by informing MURRAY that the deadline for nominating directors had passed.

*MURRAY's Scheme to Artificially Inflate the Trading Price of GETY*

14. On or about Tuesday, April 18, 2023, MURRAY called his brokerage firm to discuss GETY options contracts. An employee at the brokerage firm provided MURRAY information regarding MURRAY's ability to "buy back into the position" at a later date, to which MURRAY responded, "I won't be doing that."

15. On or about that same day, Individual 1 sent a text message to MURRAY asking, "What's happening on Friday/Monday?" to which Murray responded with a text message stating, "It's too secret."

16. On or about Thursday, April 20, 2023, MURRAY again called his brokerage firm to inquire about acquiring GETY call options. An employee at the brokerage firm asked about MURRAY's "proxy war" to which MURRAY responded, "they refused to engage with me" and "I have a new plan."

17. On or about that same day, Individual 1 sent a text message to MURRAY stating, "You need another press release tomorrow morning" to which Murray responded with a text message stating, "Monday."

18. On or about Friday, April 21, 2023, MURRAY owned approximately 209,250 GETY shares.

19. On or about that same day, GETY shares traded in a range between approximately $4.98 and $5.49 per share and closed at $5.06 per share.

20. On or about the following Monday, April 24, 2023, at approximately 7:57 a.m., Individual 1 sent a text message to MURRAY asking, "Any news on Getty this morning?" to which Murray responded with a text message stating, "8:30."

21. On or about that same day, at approximately 8:30 a.m., MURRAY caused a press release to be widely distributed online announcing that Trillium was making "a non-binding proposal to acquire Getty" for "$10 per share." The press release was materially false and misleading in that MURRAY had no intention of acquiring Getty and no ability to do so—either through Trillium or otherwise—and MURRAY issued the press release solely for the purpose of driving up the stock price so that he and Individual 1 could sell the shares they already owned at a higher price.

22. The press release was also materially false and misleading in that it stated that Trillium was an active investment firm with multiple "principals" who owned Getty stock. In reality, Trillium was no longer licensed to operate in Massachusetts and had less than $20 in cash on hand, and MURRAY was its only "principal."

23. The press release further stated, "The principals of Trillium Capital will hold their shares of common stock of the Company if our non-binding proposal reaches a favorable conclusion." This, too, was materially false and misleading in that MURRAY planned to sell all of his Getty stock as soon as the market opened.

24. On or about that same day, GETY opened for trading on the NYSE at $7.88 per share, nearly 56 percent above its prior closing price. Within minutes of the market's opening—

4

and without ever having reached out to Getty about his purported offer to acquire the company—MURRAY began selling the GETY shares he owned. MURRAY ultimately sold his entire remaining stake in the company (approximately 209,250 GETY shares) by approximately 10:24 a.m.— less than two hours after issuing the press release and less than one hour after the stock market opened—for approximately $1,486,467.

25. On or about that same day, between approximately 9:37 a.m. and 10:26 a.m., Individual 1 sold all the GETY shares that Individual 1 owned (approximately 75,186 GETY shares) for approximately $558,328.

*MURRAY's Obstructive Conduct*

26. On or about December 6, 2023, Individual 1 called MURRAY at the direction of federal agents and said, "I just got a subpoena from the SEC" and "they're asking me for any communications with you" related to "Getty stock." MURRAY responded, "just say there were none" and "you should delete all my texts." MURRAY further stated that text messages are "like virginity, once you delete your virginity you ain't getting it back."

27. MURRAY then instructed Individual 1 to "text me a picture [of the subpoena]" so that MURRAY could "write the response."

28. On or about that same day, at approximately 2:26 p.m., MURRAY emailed Individual 1 a proposed response to the subpoena falsely stating that Individual 1 bought Getty stock "solely based on my read of the various press releases from Trillium Capital and my knowledge that Scott Murray is a very experienced investor" and "not from any communications from Scott Murray or Trillium Capital." In fact, as MURRAY well knew, he had instructed Individual 1 to buy Getty stock.

29. In a telephone call on or about December 8, 2023, MURRAY asked Individual 1, "did you put in it what I had in the email?" to which Individual 1 responded "ya." MURRAY then stated, "it strikes me as odd how they would find you . . . unless somebody squealed on you."

30. On or about February 12, 2024, federal agents approached MURRAY, who agreed to speak with them. During the interview, MURRAY falsely denied telling Individual 1 to buy GETY shares.

COUNT ONE
Securities Fraud
(15 U.S.C. §§ 78(j)(b) and 78ff(a); 17 C.F.R. § 240.10b-5)

The U.S. Attorney charges:

31. The U.S. Attorney re-alleges and incorporates by reference paragraphs 1 through 30 of this Information.

32. On or about April 24, 2023, in the District of Massachusetts and elsewhere, the defendant,

ROBERT SCOTT MURRAY,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading, and ( c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit in connection with the purchase and sale of securities, to wit, securities of Getty Images Holdings, Inc.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a) and Title 17, Code of Federal Regulations, Section 240.10b-5.

## FORFEITURE ALLEGATION
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

33. Upon conviction of the offense charged in Count One, securities fraud, the defendant, ROBERT SCOTT MURRAY, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

34. If any of the property described in Paragraph 33, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant –

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the Court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 33 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

|  | JOSHUA S. LEVY |
|---|---|
|  | Acting U.S. Attorney |
| By: | CHRISTOPHER MARKHAM *Digitally signed by CHRISTOPHER MARKHAM Date: 2024.05.31 06:45:01 -04'00'* |
|  | CHRISTOPHER J. MARKHAM |
|  | Assistant U.S. Attorney |

May 31, 2024