IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) <br> ) <br> ) |
| v. | ) <br> ) No. 24-cr-10160-DJC |
| ROBERT SCOTT MURRAY | ) <br> ) |
| Defendant | ) <br> ) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The defendant, Robert Scott Murray, successfully navigated financial markets for decades both as a businessman and an investor. The defendant obtained a level of education, opportunity, and wealth available to only the smallest sliver of society. Then, in 2023, the defendant was faced with the prospect of losing money on his investment in Getty Images Holdings, Inc. ("Getty"), a public company traded on the New York Stock Exchange. Instead of accepting the loss and moving on—which a man in his position could have done with relative ease—the defendant decided to launch a fake takeover bid of Getty. This scheme was designed to trick the market and retail investors into driving up the trading price of Getty stock so the defendant could secretly sell the Getty stock he owned at the artificially inflated price. The defendant then attempted a cover up by misleading reporters during interviews, directing his friend to destroy evidence and lie in response to a subpoena, and lying during his interview with law enforcement.

For his conduct, the government recommends a period of incarceration of 16 months. The parties agree on many aspects of this sentencing. Most notably, the parties agree that the Court should calculate an Offense Level of 14 under the U.S. Sentencing Guidelines, resulting in a sentencing range of 15 to 21 months; the parties agree that the defendant's gain from the scheme is $227,543 and that the Court should order forfeiture in that amount; and neither party is

1

recommending a fine. The main point of contention is the appropriate period of incarceration. Undoubtedly, that the defendant agreed to plead guilty shortly after obtaining counsel in this case and prior to being charged is an important mitigating factor that the government has taken into account. However, for the reasons set forth below, the government respectfully requests that the Court not deviate from the applicable range established by the U.S. Sentencing Guidelines. A period of incarceration of 16 months is appropriate in this case.

I.      **Offense Conduct**

The defendant is a long-time investor and businessman with deep experience in the financial markets. The defendant previously served as the Chief Executive Officer of multiple public companies, including Stream Global Services and 3Com. The defendant then created Trillium Capital, a self-described "new kind of venture investment company located in Boston."[1] The defendant used Trillium Capital to invest his own money in other companies.

Between October 2022 and April 2023, the defendant purchased approximately 300,000 shares of stock in Getty, a visual media company that was publicly traded on the New York Stock Exchange under the ticker symbol GETY. The defendant intended to use these holdings, combined with his business and financial experience, to influence Getty's board of directors. The defendant was so confident in his investment that he advised a friend—identified as "Individual 1" in the Information—to buy Getty stock as well. For example, on April 5, 2023, the defendant sent a text message to Individual 1 stating, "Buy gETY" and "Lots of it." Individual 1 thereafter purchased tens of thousands of Getty shares.

The defendant's various attempts to influence Getty's direction ultimately failed. For example, on April 11, 2023, the defendant caused a press release to be published in the name of

---

[1] Trillium Capital's website is available at www.trilliumcapitalllc.com.

Trillium Capital proposing "several opportunities" for Getty to "unlock substantial incremental Enterprise Value." That same day, the defendant sent an email to Getty's investor relations department on behalf of Trillium advising Getty to, among other things, "engage a nationally recognized investment bank." Getty summarily rejected those recommendations. Shortly thereafter, the defendant requested that Getty "put forward my name for election to the Getty Images Holding, Inc Board of Directors." Once again, Getty rejected the defendant's requests.

By mid-April 2023, the value of the defendant's Getty stock had dropped, the defendant was losing money on his investment, and Getty had rejected the defendant's proposals. It was at this point that the defendant decided to mitigate his personal losses in Getty stock by deceiving the market and at the expense of retail investors. The defendant appears to have developed this plan alone, holding back the details even from Individual 1.[2] The plan involved a press release in the name of Trillium Capital announcing a fake takeover attempt of Getty.

On Friday, April 21, 2023, Getty stock traded in a range between approximately $4.98 and $5.49 per share and closed at $5.06 per share. The following Monday, April 24, at approximately 8:30 a.m., the defendant caused a press release to be widely distributed online announcing that Trillium Capital was making "a non-binding proposal to acquire Getty" at "$10 per share." In reality, the defendant had no intention of acquiring Getty and no ability to do so; the defendant issued the press release solely for the purpose of driving up the stock price. The press release further stated that Trillium Capital was an active investment firm with multiple "principals" who owned Getty stock. In reality, Trillium Capital was no longer licensed to operate in Massachusetts

---

[2] On Tuesday, April 18, 2023, the defendant and Individual 1 discussed Individual 1's continued ownership of Getty stock via text messages. The defendant stated that something would be happening the following "Friday" or "Monday." When Individual 1 inquired "What's happening on Friday/Monday?" Murray responded with a text message stating, "It's too secret."

3

and had less than $20 in cash on hand, and the defendant was its only "principal." The press release also stated that the multiple "principals of Trillium Capital" would "hold their shares of common stock of the Company if our non-binding proposal reaches a favorable conclusion." This, too, was not true; the defendant planned to sell all the Getty stock he owned as soon as the market opened.

The false statements in the press release were widely distributed and reported on by various print and television news outlets.[3] The predictable result was that the trading price of Getty stock increased. Getty shares opened for trading that Monday on the New York Stock Exchange at $7.88 per share, nearly 56 percent above the prior closing price. This increase in the trading price reflects that retail investors acted on the defendant's false statements. Ex. A, Gov't Expert Report at ¶¶ 10-15 (providing analysis by the U.S. Securities & Exchange Commission in support of the conclusion that the "April 24, 2023 press release resulted in an increase in Getty's stock price").

The defendant took advantage of the artificially inflated prices by immediately selling his Getty stock. By approximately 10:24 a.m.— less than two hours after issuing the press release and less than one hour after the stock market opened—the defendant sold his entire remaining stake in Getty (approximately 209,250 shares) for approximately $1,486,467. By doing so, based on a conservative estimate by the U.S. Securities & Exchange Commission, the defendant avoided at least $227,543 in losses that he would have otherwise incurred if the defendant had sold his shares without launching the fake takeover bid. *Id.* at ¶ 16 (Exhibit 2, entitled "Ill-Gotten Benefits from Selling at Prices Inflated by the April 24, 2023 Press Release" and finding that the "[l]ower-bound estimate of ill-gotten benefit" to the defendant as a result of this scheme was "$227,543").

---

[3] As just one example, the following is a link to a clip from a CNBC business news show reporting on the defendant's fake takeover bid: https://www.cnbc.com/video/2023/04/24/cramers-first-take-getty-images-is-a-steal-at-10-per-share.html.

The defendant then began covering his tracks. On the same day he sold all his shares, the defendant gave interviews to news outlets in which he discussed Trillium Capital's offer to buy Getty. At no point did the defendant tell reporters that he had already sold all his Getty stock, and he instead continued to portray the Trillium Capital offer as legitimate. For example, in the afternoon of April 24, 2024, Thomson Reuters Corporation ("Reuters") published an article describing an interview with the defendant.[4] The defendant claimed that "the $4 billion bid for Getty . . . was genuine" and that the defendant "could allow Getty's large investors - the Getty Family, Koch Industries and Neuberger Berman - to roll some or all their shares into the deal."

Beyond his public statements, the defendant also privately directed Individual 1 to obstruct the investigation into the defendant's conduct. On December 6, 2023, Individual 1 called the defendant at the direction of federal agents and said, "I just got a subpoena from the SEC" and "they're asking me for any communications with you" related to "Getty stock." The defendant responded, "just say there were none" and "you should delete all my texts." When Individual 1 stated that Individual 1 does not delete her texts, the defendant responded, "don't keep mine" and "erase all of mine now." The defendant further stated that text messages are "like virginity, once you delete your virginity you ain't getting it back" and also instructed Individual 1 to "text me a picture [of the subpoena]. . . and I will write the response for you."

After receiving a copy of the subpoena from Individual 1, the defendant provided Individual 1 a proposed response via email. The defendant instructed Individual 1 to lie, for example, by claiming that Individual 1 bought Getty stock "solely based on my read of the various press releases from Trillium Capital and my knowledge that Scott Murray is a very experienced

---

[4] The article is available at https://www.reuters.com/markets/deals/trillium-capital-offers-buy-getty-images-values-it-395-bln-2023-04-24/.

investor" and "not from any communications from Scott Murray or Trillium Capital." The defendant also continued to follow-up with Individual 1 to make sure the cover up succeeded. For example, during a phone call on December 8, 2023, the defendant asked Individual 1 to confirm that Individual 1 responded to the subpoena with the lies the defendant provided and also suggested that "somebody squealed." As another example, the defendant sent Individual 1 a text message on January 8, 2024, asking, "any more on GETY," to which Individual 1 replied, "[n]othing so far." Federal agents then approached the defendant on February 12, 2024, and during that interview the defendant once-again lied, for example, by claiming that he never told Individual 1 to buy Getty stock.

## II. Calculation of "Loss" and Applicable Forfeiture

The parties agree that the Court should calculate the "loss" from this scheme as $227,543 and order that the defendant pay $227,543 in forfeiture. This is a change in position by both parties. In the plea agreement, the parties agreed that, for purposes of the U.S. Sentencing Guidelines, the Court should calculate "loss" under Section 2B1.1(b)(1) by looking to the "gain" from the scheme. Dkt. 2, Plea Agreement at ¶ 3 (referencing Section 2B1.1, Application Note 3(B)). The government reserved the right to argue that the "gain" was more than $250,000, while the defendant reserved the right to argue that there was no "gain." *Id.* The Court thereafter ordered an expert discovery schedule so that the parties' respective experts could analyze the amount of "gain" (if any) prior to sentencing. Dkt. 22 (Order setting deadlines for expert discovery). Now that expert discovery is complete, the parties agree that the Court should calculate the "loss" under Section 2B1.1(b)(1) as $227,543, which represents the defendant's "gain" from the scheme, and that the Court should enter a forfeiture order in that amount.

The government's recommendation represents a conservative approach in two ways. First, the government's expert report determined that the defendant's "ill-gotten benefit" from the scheme was between $227,543 and $481,013, such that $227,543 represents the "[l]ower-bound estimate" of the defendant's benefit. *Id.* Second, $227,543 does not include the "ill-gotten benefit" to Individual 1. The government took this approach given that, among other factors, the government could not determine with sufficient certainty the precise loss amount (except that the defendant's "gain" was at least $227,543) and in recognition of the fact that Individual 1 has not been charged, identified as a co-conspirator, or otherwise identified as someone who was "in on" the defendant's scheme. That the government took this conservative approach supports its sentencing recommendation, including its request that the Court order a period of incarceration of 16 months, which is at the low end of the applicable sentencing range.

### III.  Calculation of the Offense Level

The government and defense agree that the defendant's total "Offense Level" under the Guidelines is 14[5] calculated as follows:

- Defendant's base offense level is 7, because Defendant's offense of conviction is referenced to USSG § 2B1.1 and carries a statutory maximum term of imprisonment of 20 years or more (USSG § 2B1.1(a)(1));

- Defendant's offense level is increased by 10, because the offense involved a gain of more than $150,000 but not more than $250,000 (USSG § 2B1.1(b)(1)(F));

- Defendant's offense level is increased by 2, because Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation (USSG § 3C1.1);

- Defendant's offense level is decreased by 2, because Defendant qualifies as a Zero Point Offender (USSG § 4C1.1); and

---

[5] This is two points below the Offense Level of 16 that the government agreed to in the plea agreement. The reduction is based on the parties' subsequent agreement to jointly recommend that the Court calculate a "loss" of $227,543, which is below $250,000. *See* USSG § 2B1.1(b)(1)(F), (G).

- Defendant's offense level is decreased by 3, because Defendant has accepted responsibility for Defendant's crime (USSG § 3E1.1).

The resulting sentencing range is 15 to 21 months of incarceration.

**IV. Sentencing Recommendation**

For the reasons set forth below, the government recommends a sentence of 16 months of incarceration, 36 months of supervised release, and forfeiture in the amount of $227,543.

*A. Promoting Respect for the Law and Deterring Criminal Conduct*

The defendant deceived the market and retail investors for his own benefit. The defendant's fake takeover bid was widely publicized, including through popular television programs and print media sources, and was specifically designed to manipulate the stock of a well-known public company that is traded on the New York Stock Exchange. When the defendant learned that he was being investigated, he set out to destroy evidence and lie to investigators. The defendant's conduct—both the market manipulation and the obstruction—is a serious matter. Market manipulation has long been recognized as having substantial, detrimental consequences to the United States' financial markets. *Basic Inc. v. Levinson*, 485 U.S. 224, 246–47 (1988) ("[A]rtificial manipulation tends to upset the true function of an open market. . . . [I]t is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?") (citations omitted). And there can be no reasonable dispute that obstruction of justice has equally substantial, detrimental consequences to the enforcement of United States law.

The Court must therefore fashion a sentence for the defendant that deters others who may consider committing similar crimes. As a general matter, the First Circuit has "emphasized the importance of general deterrence in white-collar crime." *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012). When it comes to a stock manipulation scheme planned a week in advance, as

8

was the case with the defendant, the need for general deterrence is particularly acute. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (explaining that where "economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity' these crimes are 'prime candidates for general deterrence'") (quoting Stephanos Bibas, *White–Collar Plea Bargaining and Sentencing After Booker,* 47 Wm. & Mary L.Rev. 721, 724 (2005)); *see also id.* at 1240-41 ("Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment. . . . Our assessment is consistent with the views of the drafters of § 3553. As the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as 'particularly important in the area of white collar crime.'") (citing S.Rep. No. 98–225, at 76 (1983)).

General deterrence is also particularly important in this case given the public nature of the defendant's crime. The defendant manipulated a stock that is widely known and traded on the New York Stock Exchange. There was also publicity around the fake takeover bid through television and print media, caused in no small part by the defendant's decision to sit for interviews to discuss his (secretly fake) takeover offer. The public is now aware that this takeover bid was a fraud and that the defendant obstructed the subsequent investigation. Under these circumstances, a failure to sentence the defendant to a substantial period of incarceration would send a terrible message to other participants in the public securities markets.

>  B. *History and Characteristics of the Defendant, the Nature and Circumstances of the Offense, and the Need to Provide Just Punishment*

The defendant's sentencing memorandum will no doubt cast the defendant in a favorable light: a dedicated family man with a history of philanthropy who has been humbled by this experience. That all may be true, and the Court should consider those mitigating factors. But the Court should also consider that the defendant's history and characteristics—a life successfully

9

navigating financial markets and obtaining a level of wealth and opportunity available to few—also serve as substantial aggravating factors under the circumstances of this case. The defendant's high level of education and expertise meant he had a clear-eyed understanding of his criminal conduct. The defendant also did not act out of desperation, distress, or the need to provide for himself or his family. When it came to his investment in Getty, the defendant simply got greedy, spent a week planning and committing a crime to save himself $227,543, and then spent months covering it up. The Court should sentence the defendant accordingly.

### C. Need to Avoid Unwanted Sentencing Disparities Among Defendants in Similar Cases

In addition to serving as a general deterrent and being specifically appropriate given the defendant's history and characteristics, a sentence of 16 months would also avoid unwanted disparities among defendants in similar cases. Cases involving economic crimes by highly educated defendants regularly result in a substantial period of incarceration.[6] According to U.S. Sentencing Commission data for the last five fiscal years (2019-2023), there were 422 defendants whose primary guideline was §2B1.1, with an Offense Level of 14 and a Criminal History Category of I, as is the case here. The vast majority of those defendants (81%) received a sentence that included a period of incarceration, and the median length of incarceration was twelve months.[7] The government is recommending a sentence of 16 months in this case—at the lower end of the applicable sentencing range but four months above the median sentence according to Sentencing

---

[6] As an example in this District, in *United States v. Carey*, 16-cr-10354-ADB, the Court was faced with an economic crime by an individual with a high level of education in the pertinent industry—tax avoidance by an accountant—that resulted in a loss of more than $250,000. The defendant was sentenced to 18 months of incarceration.

[7] This data set excludes defendants who received a substantial assistance departure under Section 5K1.1 and is available at https://jsin.ussc.gov.

10

Commission data—because of the public nature of the defendant's crime, the defendant's obstructive conduct, and the defendant's personal history and characteristics, as described above.

### V.  Conclusion

For the reasons herein, the Court should order the following sentence: 16 months of incarceration, 36 months of supervised release, forfeiture of $227,543, and the mandatory special assessments of $100.

                Respectfully submitted,

                JOSHUA S. LEVY
                United States Attorney

      By:   */s/ Christopher J. Markham*
                CHRISTOPHER J. MARKH-AM
Dated: October 17, 2024         Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

      I, Christopher J. Markham, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                                                 By:    */s/ Christopher J. Markham*
                                                                                         CHRISTOPHER J. MARKHAM
                                                                                         Assistant U.S. Attorney