# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT SCOTT MURRAY,<br><br>                    Defendant | **FILED UNDER SEAL**<br>(Leave to file granted on 10-17-2024)<br><br>Criminal Case No. 1:24-cr-10160-DJC |

## SENTENCING MEMORANDUM ON
## BEHALF OF ROBERT SCOTT MURRAY

### I.    Introduction

Four years ago, Robert Scott Murray ("Scott") was a happily married man, loving father, and successful entrepreneur. Raised in London, Ontario by working class parents, Scott worked his way up to a C-suite position at an education software company in Cambridge, Massachusetts. He settled in the Boston area, where he met his now ex-wife and raised his three children. But after almost thirty years of marriage, Scott's wife told him she no longer loved him and that she wanted a divorce. Heartbroken, Scott's life as he knew it slowly started to unravel.

By April of 2023, Scott was a version of himself he did not recognize. During this time he committed a crime, and he now deeply regrets those actions, which was inconsistent with how he had lived his life up to that point. These transgressions relate to Scott's trading in Getty Images ("Getty") securities, and his severe missteps following those investments. Scott has lived each day since with a deep sense of regret, despair, and remorse. Whereas he once had a wife and family, he now lives alone in Mashpee, Massachusetts and attends therapy weekly. (*See* Exhibit A, Letter from Jacques-Paul T. Barbour, M.Ed., LMHC). He also continues to financially and emotionally support his children – ███████████████████.

In fashioning an appropriate sentence for this 61-year-old first-time offender, the Court must determine a sentence that is "sufficient, but not greater than necessary" to serve the sentencing goals enumerated in 18 U.S.C. § 3553(a). Scott fully accepts responsibility for his conduct and is deeply embarrassed and remorseful. Through the submission of this memorandum, Scott in no way attempts to excuse his behavior or minimize the gravity of his offense. Rather, he respectfully submits this memorandum with the hope that this Court may see Scott as a whole person and in the context of his life at the time. With full consideration of the facts and circumstances detailed below, including the letters of support submitted on his behalf, Scott respectfully submits that a sentence of one day in custody, deemed served, followed by two years of supervised release with the first six months to be served in home confinement, would be "sufficient, but not greater than necessary" to meet the sentencing goals set forth in 18 U.S.C. § 3553(a).

### Personal Background and Characteristics

#### A.   Brief Personal Overview

Scott is a 61-year-old Canadian-American with no prior criminal history. He promptly accepted responsibility for his conduct once the United States Attorney's Office began investigating this matter, and soon after pled to an Information. The letters of support submitted with his Memorandum demonstrate that, but for this crime, Scott has lived a life of professional and personal integrity, and has devoted his life to his family, friends, and his community.

#### B.   Scott's Early Years and Professional Reputation

Scott was raised in London, Ontario by his father, an English school teacher, and his mother, a stay-at-home mom, along with his two brothers, █████ and █████. They grew up in humble conditions; Scott worked part-time jobs throughout high school and college to afford his

expenses. Those who have known Scott for decades describe him as an "honorable and truthful" man. (<u>Exhibit B</u>, Letter from Michael Winter). While he often had challenges in school due to his ████, he made up for it with his work ethic. For example, as a teenager he started his own landscaping business.

Scott attended college in Toronto and took an accounting role at Arthur Anderson & Co. after graduation and became a chartered accountant in 1987. After almost ten years at Arthur Anderson, he immigrated to the United States, accepting a role as Chief Financial Officer for one of his former clients, The Learning Company, a Cambridge, MA based educational software company that was "the largest consumer software company at the time." (<u>Exhibit C</u>, Letter from Darren Telfer). Since then, Scott has had significant positions at a variety of companies, including, President of Stream International Inc; Chief Executive Officer of Modus Media International; Chief Executive Officer of 3Com; and Chief Executive Officer of Stream Global Services. Through his successes, Scott became somewhat of a local hero, with his friends' parents, who thought "very highly" of him, "collect[ing] articles on Scott's achievements." (*Id.*).

Those who worked with Scott describe him as someone who has "always held himself to a high standard of ethics, values and professionalism. . . As a business owner, entrepreneur and on an individual level, Scott has always led by example with friends, family and colleagues." (<u>Exhibit D</u>, Letter from David Bonnema). Below are a few examples of Scott's character, reflecting the impact he has had on his friends and colleagues:

- Scott was "at all times [] a consummate professional and a conscientious, supportive colleague. . .  He brings [] a meticulous sense of industry and years of timeless adherence to the law." (<u>Exhibit E</u>, Letter from Tim & Helen Wright).
- From a former coworker while at Arthur Anderson: "Scott has always demonstrated the highest level of ethics and integrity in his work and personal life. He has an incredibly strong work ethic and . . . he always holds himself to legal and ethical standards." (<u>Exhibit F</u>, Letter from Lorrie King).

- His former coworker while at Stream Global Services recounted that Scott "was extremely hard working" and "committed to leading [these companies] with integrity." (Exhibit G, Letter from Gillian Hsieh).

- Another coworker from Modus Media shared that he "always found Scott to be truthful, forthright and never once did he cross any ethical lines. He was a good business leader who was honest and fair with his team, our customers, and the Board of Directors." (Exhibit H, Letter from Tim Adams).

- His former coworker while at Stream International and Stream Global said he has "always been impressed by [Scott's] positive communication style, team building skills, and ability to connect with people from any culture. His exceptional leadership abilities have been responsible for the creation of tens of thousands of jobs in the U.S. and globally." (Exhibit I, Letter from Jeffrey Bishop).

- "Scott [] influences the course of the companies to become the best version of themselves, creating the same effect on their teams and coworkers. . . He created such a strong culture that everyone wanted to contribute to the well-being of the company, as we all felt part of something meaningful." (Exhibit J, LinkedIn Recommendation from former coworker, Fanny Noguera).

Many of Scott's former colleagues also praised his leadership skills, particularly that he "does the right thing regardless of the cost to him personally." (Exhibit J, LinkedIn Recommendation from William Ribaudo, Board Member and CEO Advisor). As many who have worked close to him recount in their letters of support:

- Scott is "a compassionate leader" who "went out of his way to help people, be they customers, employees, or colleagues." (Exhibit K, Letter from Daniel Beck).

- Scott "consistently demonstrated a strong commitment to both his work and the well-being of those around him [and] had a remarkable ability to foster a sense of camaraderie within the teams he managed, ensuring that employees felt they were working with him, not for him." (Exhibit L, Letter from Sheila Flaherty).

Many former coworkers also lauded Scott's selflessness as a business leader. For example, when Modus Media was being acquired, Scott— as CEO at that time—prioritized negotiating retention bonuses for his employees, even though he would not receive a bonus. "His willingness to risk the deal for the sake of his employees' financial well-being speaks volumes about his character and integrity." *Id.* Another former colleague recalled this same event, saying,

4

- "Scott knew he would be leaving [Modus Media] but spent considerable time, with relatively little benefit to himself, insuring that employees were taken care of with respect to employee agreements, stock options and other post-sale matters that directly benefitted the employees." (Exhibit K, Letter from Daniel Beck).

Those who worked with Scott at other companies recalled this same kind of selfless behavior from Scott. Speaking about their time working together while at 3Com, a former coworker recalls that,

- "Scott did the most virtuous and selfless thing that I have ever seen a person do. He gave up his position, compensation, and stock options and left the company over a perceived lack of honesty, integrity, and proper financial reporting at a subsidiary. . . [H]e put his principals [sic] ahead of his own interests in the name of doing what was right, or in this case, not being part of something that he perceived as being wrong." *Id.*

After many stints as Chief Executive Officer of various companies, Scott formed Trillium Capital in 2007, an investment management firm for which Scott serves as managing partner. He has wound down his business ventures over time to focus on his health and his children, Scott manages his own real estate business, owning and managing residential properties around Cape Cod, a business which he built for the benefit of his children. Given that he is the sole employee, he fears if he were incarcerated the business would fail and there would be little value left for them.

### C. **Scott Murray Is A Loving Father and Compassionate Caretaker**

Scott is a loving father, son, and brother. Scott's commitment to his family has been unwavering since he was just a little boy. As one of Scott's oldest friends put it:

- "Scott Murray is a person of integrity, honesty, and kindness. He consistently demonstrates these qualities with sincerity and a genuine desire to do what is right. His values and sense of self were born through a strong, loving family environment and his commitment to those values is consistent and unwavering."(Exhibit M, Letter from Mikel Peesker).

It is clear to anyone who has met Scott that his entire world is his three children. His eldest,

████████████████████████████████████████████████████████████

████████████████████████████████████████ Scott worries that if he were to go to prison,

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

Scott also cares for his beloved four-year-old Berne-Doodle, Max. On September 28, 2024, a woman trespassed into Scott's house while he was out with his son, ███████, and stole Max. The woman who stole Max later trespassed at ███████ condo which sent him into a psychotic state. Scott has done everything in his power to find Max and is hopeful he will be found soon and safely returned home.

Above all, Scott's "children love and trust their father, and they have learn[ed] the strength and support of strong familial bonds from him."  (Exhibit E, Letter from Tim & Helen Wright). Those who know him say it best:

- "As a father, Scott is exemplary. He is devoted to his children and works tirelessly to provide them with love, support, and guidance. Despite the challenges he is facing, he remains a pillar of strength for his family and his children are fortunate to have such a loving and dedicated father." (Exhibit M, Letter from Mikel Peesker).
- "Scott is a dedicated father to three adult children [] who share his love of fishing, animals and travel." (Exhibit E, Letter from Tim & Helen Wright).

Scott is also very close with his parents, who still reside in London, Canada. One of his oldest friends recalls that "Scott was raised by the two most honest, loving, and caring parents in a strict no-nonsense home who wouldn't put up with any dishonesty or shenanigans from him." (Exhibit N, Letter from Geoff Harris). Both of his parents ██████████████████. Scott's father, ████████████████████████, and his mother, █████████████████████ i



███████████████████████████. Finally, Scott is also close to his two brothers, who both ███████.

### D.  Scott's Charitable Nature

Having started from humble beginnings, it is important to Scott that he give back to communities in need. In addition to counseling others diagnosed with ██████████, Scott is a frequent supporter of various causes. Over the years, he has donated to various charities, including: the Prevention of Sexual Violence Against Women, Pan Mass Challenge, Berklee School of Music, the Museum of Fine Arts, and Build.Org. He was also a founding member of Canadian Executives in New England (CENE), an organization that mentors entrepreneurs across the globe.

### E.  Scott Murray's Divorce

Even before this incident, Scott's life was not without challenges. In late 2020, Scott's wife of almost three decades, Kathleen, told Scott she no longer loved him and filed for divorce. The divorce had a substantial impact upon Scott and was finalized in the summer of 2024.  Scott is devastated by the demise of his marriage.

### F.  Scott's Physical and Mental Health Struggles

Scott also ████████ ██████████████████████████. ██████████
███████████████████████████████████████████████
█████████████████████████" (Exhibit O, Letter from Dr. Richard Dupee). ██
███████████████████████████████████████████████
███████████████████████████████████████████████



██████████ ████████████████████████████████████████████████

████████████████████████████████████████████████ ██████████████

████████████████████████████████ Both of these ██████████

████████████████████████████████ Scott

often speaks to individuals who have been recently ████████ ████████ ███ ████

████████████████████████

Scott also ██████ ████████████. He has █████████████████████"

██████████████████ ████████████ ████████████████. *See id.*

Additionally, ██████ ████████████████████, *Id.* ██████████

████████████████████████████████████████████████

██████████ *Id.*

Scott's divorce and his ██████ are particularly germane to his actions in this case. Three years into bitter divorce proceedings that seemed to have no end in sight, Scott was at his lowest point from spring of 2023 through spring of 2024. With the strain of his divorce and his ████████████ Scott ████████████ ████████ ███

████████████ In May of 2024, after being charged in this case, ██████

████████████████████████████████████████████████

██. The memories of this ██████ still haunt him, and he fears the possibility of being imprisoned and being away from the stabilizing characteristics of his life—his children, his family, his dog Max, and regular access to therapy.

---

[1]    *See* ████████████████████████████
████████████████████████████████████.
[2]    Scott ████████████████████████████
█████████████████████████
█

### G.  Statement of Offense Conduct and Admission of Guilt

Scott does not contest the statement of offense conduct as it is set forth in the Plea Agreement (ECF 2) (the "Plea Agreement"), Information dated May 31, 2024 (the "Information"), and the Initial Presentence Investigation Report dated August 29, 2024, with the inclusion of Scott's objections sent to Probation Officer Kaileen Paiva dated September 12, 2024 (the "PSR"). **He acknowledges that his conduct was wrong, indefensible, and criminal, and he takes full accountability for his actions**. Scott also regrets that he was not fully transparent when agents from the Federal Bureau of Investigation came to speak with him. He offers no excuses for that conduct beyond the fact that he simply panicked and compounded his initial poor choices. Through conversations with his friends and family about what has transpired, it is evident that Scott is deeply remorseful over what he has done. As many close to him recount in their letters of support:

- "I know Scott is remorseful of his actions, he would certainly not make these mistakes again [and] I remain convinced of his moral character." (<u>Exhibit E</u>, Letter from Tim & Helen Wright).

- "I have personally spoken to Scott many times since these events have occurred and he is truly a man of remorse and greatly humbled. But I fear for his children, *__I beseech you please don't destroy these children's lives__*, which is no doubt the future these children will face if their father is in jail; The scorn and ridicule they will be forced to endure causing life long and irreversible damage." (<u>Exhibit P</u>, Letter from Jamie Regan) (emphasis added).

- "I've never known Scott to be purposely dishonest and any example would be wholly uncharacteristic, unintentional and truly a mistake. Scott is a man who is introspective, remorseful and learns from his mistakes [and] any separation from his loved ones would serve as redundant because Scott would have already understood and agonized over his mistake and how it has affected others. He will have felt and continue to feel remorse and learned the lessons of how to govern himself going forward." (<u>Exhibit M</u>, Letter from Mikel Peesker).

## II.   SCOTT MURRAY'S ADVISORY GUIDELINES SENTENCING RANGE

An advisory guidelines sentencing range is the product of two factors: (1) the defendant's criminal history category; and (2) the instant offense level. *See* USSG Ch. 5 Pt. A. Scott is a first-

time offender and has accepted responsibility for his actions. *See* Plea Agreement at 2. Scott

therefore has zero criminal history points, *see* USSG § 4A1.1, which means his criminal history

category is **Level 1**. *See* USSG Ch. 5 Pt. A.

As for the offense level, the parties agree that:

a.   Scott's base offense level is 7 pursuant to USSG § 2B1.1(a)(1);

b.   Scott's offense level is increased by 2 under USSG § 3C1.1 for his attempt to
obstruct the Federal Bureau of Investigation;

c.   Scott's offense level is decreased by 2 under USSG § 4C1.1 because he qualifies
as a Zero Point Offender; and

d.   Scott's offense level is decreased by 3 under USSG § 3E1.1 because he
promptly accepted responsibility for his crime.

*See* Plea Agreement at 2. Based on just these agreements, Scott's offense level would be a level 4.

### A. Although Scott Realized a Net Loss From His Getty Trades, He and the Government Agree that the Loss Amount Under USSG § 2B1.1(b)(1) is $227,543.

For Scott's offense of conviction, the advisory guidelines increase the offense level if there

was a loss exceeding $6,500. *See* USSG § 2B1.1(b)(1). For the purpose of calculating Scott's

advisory guidelines sentencing range, the Parties agree that the loss under USSG § 2B1.1(b)(1) is

$227,543.[4] A loss of $227,543 increases Scott's base offense level by 10 levels, resulting in a total

offense level of 14. *See* USSG § 2B1.1(b)(1). With a Level 1 Criminal History Category and an

offense level of 14, ***Scott's advisory guidelines sentence ranges from 15 to 21 months***

***incarceration***. *See* USSG Ch. 5 Pt. A.

---

[4]      However, as is explained in Section IV(A), *infra*, Scott actually realized a *net loss* from his Getty trades.

**B. Even by Applying the Government's Loss Calculation Methodology, the Loss Amount Under USSG § 2B1.1 Would Still be Under $95,000.**

In its theory of loss, the Government places great weight on arbitrary trading dates for the calculation of loss. For example, the Government's expert compared the proceeds Scott and Individual 1 received when they sold their shares and call options following the April 24, 2023 press release with the proceeds they hypothetically could have made if they had sold on April 21 or April 26. *See* Expert Report of Stephen Graham dated September 25, 2024 ("Government's Expert Report") at ¶ 16; *cf.* Exhibit Q, Expert Report of Jimmy S. Pappas, dated October 10, 2024 ("Pappas Report") at § 4.3. However, by April 21 and April 26, Scott had already issued several press releases regarding Getty. *See* PSR at ¶ 15. The Government's expert thus illogically compares Scott's actual sales to *hypothetical* sales that *hypothetically* would have been affected by the same scheme.

It is much more justified to compare Scott's and Individual 1's proceeds on April 24 to the proceeds they could have made if they sold on ***April 10***—the day before Scott issued the first press release regarding Getty. This more appropriate analysis yields a combined gain of $93,959, which under the guidelines would increase Scott's offense level by 6, resulting in a **total offense level of 10**. *See* USSG § 2B1.1(b)(1). *See* Pappas Report at § 5.4. Mr. Pappas's analysis applies the Government's methodology for calculating loss, which does not account for the premiums Scott paid to acquire many call options that expired worthless. Once those expenditures are accounted for, however, it is undisputed that Scott actually realized a *net loss* of $170,586 from his trading in Getty. *See* Pappas Report at ¶ 20, Table 1. With a Level 1 criminal history and an offense level of 10, ***Scott's advisory guidelines sentence ranges from 6 to 12 months incarceration***. *See* USSG Ch. 5 Pt. A. In fact, Scott reported a loss of about $450,000 from trading in Getty on his 2023 income tax documentation. (*See* Exhibit R, Letter from Douglas Theobald, CPA).

### III. A SENTENCE OF ONE DAY IN CUSTODY, DEEMED SERVED, FOLLOWED BY TWO YEARS SUPERVISED RELEASE BEGINNING WITH SIX MONTHS HOME CONFINEMENT IS FAIR, JUST, AND SUFFICIENT TO MEET THE GOALS OF SENTENCING SET FORTH IN 18 U.S.C. § 3553.

As this Court is well aware, calculating a defendant's advisory guidelines range is only the "starting point" in determining what sentence to impose. *United States v. Saez*, 444 F.3d 15, 17 (1st Cir. 2006). In fact, the Court may not even "presume that the Guidelines range is reasonable," but instead must "make an individualized assessment based on the facts presented." *Gall v. United States,* 552 U.S. 38, 49-50 (2007). Ultimately, a defendant's sentence should reflect the parsimony principle, which directs the Court to "'impose a sentence sufficient, ***but not greater than necessary***' to accomplish the goals of sentencing." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (citation omitted; emphasis added).

To satisfy the parsimony principle, the Court engages in a "holistic inquiry" of all the sentencing factors enumerated in 18 U.S.C. § 3553. *Rodriguez*, 527 F.3d at 228. Those factors include, among others, the defendant's history and characteristics, the seriousness of the offense, deterring future crime, and avoiding unwarranted sentence disparities among defendants found guilty of similar conduct. *See* § 3553(a). The Court "considers [these] factors as a group and strive[s] to construct a sentence that is ***minimally sufficient*** to achieve the broad goals of sentencing." *Rodriguez*, 527 F.3d at 228 (emphasis added). The Court thus has discretion to impose a sentence below the advisory guidelines range, "subject only to the ultimate requirement of reasonableness." *United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006). Here, a sentence of one day in custody, followed by two years supervised released, beginning with six months home confinement, is sufficient, but not greater than necessary to address Scott's culpability, achieve the goals of deterrence, and avoid unwarranted sentencing disparities.

**A. Scott's Advisory Guidelines Range Is Unreasonable Because It Relies Too Heavily on An Arbitrary Loss Table While Ignoring Scott's Personal Characteristics, Remorse, And Acceptance of Responsibility.**

But-for USSG § 2B1.1's loss table, the guidelines would recommend a Zone-A sentence for Scott ranging from probation to 6 months incarceration. However, applying the Parties' stipulated loss amount ***more than triples*** Scott's advisory sentencing range to 15 to 21 months incarceration. The Court should decline to follow the loss table's arbitrary guidelines in this case, particularly because Scott actually realized a *net loss* from his trading in Getty.

Indeed, it is well established that the Court "can deviate from the guidelines based on general policy considerations" and "policy disagreements with the guidelines." *Rodriguez*, 527 F.3d at 227 (citation omitted). Courts across the country often depart from the guidelines in economic crime cases to avoid the loss table's arbitrary and unjust impact on defendant's sentencing ranges. *E.g.*, *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) ("The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense"); *United States v. Musgrave*, 647 F. App'x 529, 538-39 (6th Cir. 2016) ("the data suggest that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases."). In fact, in 2022, courts imposed below-guidelines sentences in ***more than fifty-five percent of cases involving the loss table***. *See* Statement of Daniel Dena Before the United States Sentencing Commission's Public Hearing on Proposal 1: Loss, dated Feb. 27, 2024.

This very Court has recognized the loss table's flaws in previous cases. *E.g.*, Transcript of Statement of Reasons at 5, *United States v. McPhail*, No. 1:14-cr-10201 (D. Mass. Sep. 18, 2015) (Casper, J.) ("The advisory guideline sentencing range . . . ***is often an imperfect factor when it's***

*driven, as it is here, largely by the loss amount*."); Tr. of Sentencing at 45, *United States v. Parigian*, No. 1:14-cr-10201 (D. Mass. Aug. 17, 2015) (Casper, J.) ("I've also considered, even as I think the loss amount was properly calculated, *that it is an imperfect proxy for what the sentence should be here*…").

This criticism of the loss table is justified. <u>First</u>, the loss table is undeniably arbitrary. For reasons unknown, "the loss guidelines were **not** developed using an empirical approach based on data about past sentencing practices." *United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016) (emphasis added); *see also United States v. Johnson*, No. 16-CR-457-1, 2018 U.S. Dist. LEXIS 71257, at *11-12 (E.D.N.Y. Apr. 27, 2018) ("As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime"). "Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less solely responsible for a white-collar offender's Guidelines sentence." *Johnson*, 2018 U.S. Dist. LEXIS 71257, at *12.

<u>Second</u>, by largely focusing on a single factor in all economic cases, "the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *Gupta*, 904 F. Supp. 2d at 351 (internal citation omitted). Here, the loss table ignores that: (i) Scott has never before been convicted of a crime; (ii) Scott committed the instant offense when he was struggling with ███████████ due to the unexpected divorce from his wife of nearly thirty years; (iii) Scott promptly accepted responsibility for his actions; and (iii) as the letters in support of him show, Scott is of good moral character and not likely to reoffend.

Finally, adhering to the loss table is particularly unjust in this case given that Scott actually realized a *net loss* of about $450,000 from his trading in Getty, as reported on his 2023 income tax return. (*See* Exhibit R, Letter from Douglas Theobald, CPA). When drafting USSG § 2B1.1, the Sentencing Commission expected that loss amount would "reflect[] both 'the harm to the victim' and the 'gain to the defendant.'" *United States v. Costello*, 16 F. Supp. 2d 36, 39 (D. Mass. 1998) (emphasis in original) (reviewing application notes for original loss table). But this Court knows that is not always true. *Id.* (departing downward where defendant's cut of scheme was less than 1% of the value of the goods stolen); *United States v. Watt*, 707 F. Supp. 2d 149, 153 (D. Mass. 2010) (departing downward where defendant "received no money" for his participation in theft scheme).

In this case, between October 2022 and April 2023, Scott and Individual 1 purchased 385,736 shares of Getty stock and Scott purchased 29,583 Getty call options contracts. *See* Pappas Report at Table 1. Although Scott and Individual 1 sold their shares and a small number of call options on April 24, 2023, an overwhelming majority of the call options (24,978 of the 29,583) expired worthless while still in Scott's possession. *See* Pappas Report at Table 1. Yet, Scott paid $912,605 in premiums to acquire those Getty call options. *See* Pappas Report at Table 1. ***So, when those call options expired worthless, Scott actually lost $912,605***. Even accounting for Scott's and Individual 1's proceeds from selling their Getty stock, ***Scott still realized a net loss of $170,586 from her trading in Getty securities***. *See* Pappas Report at ¶ 20, Table 1. The Commission's expectation that loss would reflect the *gain to the defendant* is thus even more inaccurate here than in *Costello* or *Watt*.

For these reasons, this Court should decline to sentence Scott within an advisory guideline range driven almost exclusively by USSG § 2B1.1's fundamentally flawed loss table.

**B. A Sentence of One Day in Custody, Deemed Served, Followed by Two Years Supervised Release Beginning with Six Months Home Confinement Will Achieve § 3553's Sentencing Goals.**

### i. *Specific Deterrence*

At 61 years old, Scott has no prior convictions and no prior allegations of wrongdoing in his nearly forty years leading businesses. And as courts recognize, "[m]inimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism." *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007) (reviewing empirical data and studies). Indeed, this Court has recognized the minimal need for specific deterrence when sentencing defendants who have no prior criminal history and are remorseful for their economic crimes. *See* Tr. of Statement of Reasons at 6, *United States v. Black-White*, No. 1:11-cr-10416 (D. Mass. Feb. 5, 2014) (Casper, J.) ("I've considered specific deterrence, although, ***given your lack of a criminal history, I think that's less of a concern*** and less of a driver in my decision about what an appropriate sentence will be"); Tr. of Statement of Reasons at 5, *United States v. Stuart*, No. 1:11-cr-10416 (D. Mass. Feb. 12, 2014) (Casper, J.) ("***I'm less concerned about specific deterrence, given what I take is your remorse***, which I think is sincerely held").

Scott not only has no prior criminal charges, but he is also deeply remorseful for his actions in regard to the instant offense. As one of his longtime friends wrote:

- "Scott is a man who is introspective, remorseful and learns from his mistakes. . . [A]ny separation from his loves ones would serve as redundant because Scott would have already understood and agonized over his mistake and how it has affected others. He will have felt and continue to feel remorse and learned [] lessons of how to govern himself going forward." (Exhibit M, Letter from Mikel Peesker).

Scott's actions here were so out of character for him that his friends were shocked to learn of the situation:

- "I can say this with confidence and without hesitation, Scott has never committed a criminal act in his life that I have ever seen, witnessed or heard of. I wouldn't be

hanging out with him for all these years if he led that type of life. . . This is so beyond Scotts character that I am still struggling with it. I can't say this enough... this isn't the Scott Murray that I personally grew up with and know." (Exhibit D, Letter from David Bonnema).

The shame and remorse Scott feels for committing this crime is already deterrence enough for Scott.

Given Scott's lack of criminal history, genuine remorse, and the Court's ability to impose terms of his sentence that will satisfy any specific deterrence concerns, Scott respectfully submits that a term of two years supervised release beginning with six months home confinement is the sentence that is "minimally sufficient" to accomplish this sentencing goal under § 3553(a).

### ii.   General Deterrence

A term of supervised release with home confinement is also sufficient, but not greater than necessary to achieve general deterrence. For the remainder of his life, Scott Murray will stand as a convicted felon. He has also agreed to forfeit $227,543 in this action. Further, in a parallel civil action, the Securities and Exchange Commission seeks to enjoin Scott from ever again working as an officer or director of a company—the kind of work he devoted decades of his life to as a leader for various technology supply companies. And most importantly, when Scott's colleagues, friends, and children look at him, they will know that he committed this crime and is a convicted felon.

These significant and deeply humiliating punishments should already deter others from taking the same actions as Scott. To add a period of incarceration would be overly punitive. Indeed, this Court has recognized in other economic cases that the fact of the prosecution and resulting felony conviction often drives general deterrence as much as the specific sentence imposed. *See* Tr. of Sentencing at 45-46, *United States v. Parigian*, No. 1:14-cr-10201 (D. Mass. Aug. 17, 2015) ("I think part of the deterrent message, and perhaps ***a large part of the deterrent message is in the prosecution of this case, and not necessarily in the length of the sentence that is imposed here***. This is particularly true of Mr. Parigian and his situation in regards to the collateral consequences,

which are not insignificant here in regards to his license suspension . . . as well as the civil penalties

that are still pending"); Tr. of Statement of Reasons at 6, *United States v. McPhail*, No. 1:14-cr-

10201 (D. Mass. Sep. 18, 2015) ("Certainly a conviction has some deterrent effect").

Moreover, unlike many securities fraud cases which involve penny stock companies,

Scott's press release concerned Getty Images, a nearly four-billion-dollar company. Consequently,

Scott was publicly humiliated on national television within mere hours of issuing the press release.

For instance, Jim Cramer and David Faber launched personal attacks against Scott on *Squawk on

the Street*—CNBC's morning finance show which commands millions of viewers nationwide:[5]

> **Faber**: (*While displaying Scott's LinkedIn profile photograph, copied below*) "I don't
> know who this guy Scott Murray is . . . apparently he's not very good at taking a
> picture, but he does want to buy Getty images."



> **Faber**: (*While laughing at the photo*) "there he is . . . I mean I don't know . . ."
>
> **Faber**: (*In a sarcastic tone*) "[Getty] would really benefit apparently from his inclusion on
> the board of directors . . ."
>
> **Cramer**: "Forget that guy . . . "

Scott was also criticized in dozens of print and online media sources, including some of

the nation's largest like the *Associated Press*, *Reuters*, and *Bloomberg*.[6] Additionally, the United

States Attorneys' Office, the Securities and Exchange Commission, and the Federal Bureau of

---

[5]      *See, e.g.*, Government's Expert Report at Appendix 4.
[6]      Associated Press: https://apnews.com/article/getty-images-trillium-stock-fraud-sec-justice-department-guilty-plea-b12407e7aaf669979047536edd14b286; Reuters: https://www.reuters.com/markets/deals/trillium-capital-offers-buy-getty-images-values-it-395-bln-2023-04-24/; Bloomberg:
https://www.bloomberg.com/news/articles/2024-05-31/-sham-getty-takeover-was-actually-pump-and-dump-scheme-us-says.

Investigation each published statements regarding Scott's charges and plea – thus furthering any potential general deterrence.[7]

In this case, the collateral consequences imposed by the community as a whole largely satisfy the deterrent goal of sentencing. A sentence of supervised release with a period of home confinement is thus sufficient, but not greater than necessary given that, among other things, Scott was already mocked on national television and in the print media and will have to look at his children as a convicted felon for the rest of his life.

### iii.  Avoiding Unwarranted Sentencing Disparities.

Finally, imposing a sentence of supervised release with a period of home confinement will also avoid unwarranted disparities between Scott's sentence and those of prior defendants who had similar records and were found guilty of similar conduct. Under the uniformity principle, a particular judge is ordinarily expected to impose similar sentences on two similarly situated defendants. *See United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("Of course, if the same judge sentences two identically situated defendants to substantially different terms, some explanation may well be required"). The facts of this case compare closely with those of two other securities fraud cases that previously came before this Court: *United States v. Parigian* and *United States v. Stuart*. In each of those cases, this Court imposed community or home confinement.

***United States v. Parigian, No. 1:14-10201 (Casper, J.)***: Mr. Parigian was convicted of trading on insider information for a profit of several hundred thousand dollars. Like Scott, Mr. Parigian's criminal history category was Level 1. Mr. Parigian's offense level was 17, which is higher than Scott's total offense level. Mr. Parigian was similar in age to Scott (56 and 61 years

---

[7]       USAO: https://www.justice.gov/usao-ma/pr/trillium-capital-manager-charged-securities-fraud-scheme-involving-getty-images; SEC: https://www.sec.gov/newsroom/press-releases/2024-66; FBI: https://x.com/FBIBoston/status/1807766967886975339

old, respectively), and also suffered collateral consequences (Mr. Parigian's law license would likely be suspended while Scott now cannot serve as an officer or director of a company). Like Scott, Mr. Parigian was also a father and maintained a close relationship with his children.

Unlike Scott, though (whose illegal sales were confined to *one single day*), Mr. Parigian traded on inside information numerous times over the course of *two years*. Further, unlike the present case (wherein Scott issued a public press release that garnered significant media attention), Mr. Parigian's case involved the kind of backroom dealing that makes fraud cases so hard to detect (many of the tips were received on the green of a golf-course). Mr. Parigian was sentenced to time served (1 day) and 8 months of home confinement followed by 3 years of supervised release.

***United States v. Stuart, No. 1:11-cr-10416 (Casper, J.)***: Mr. Stuart was convicted of mail and wire fraud for his role as the finder in a kickback scheme to defraud the microcap market. With Mr. Stuart's assistance, the enterprise obtained tens-of-thousands of dollars in fraudulent financing. Like Scott, Mr. Stuart had no prior convictions, and his offense level was 11.

Also like Scott, Mr. Stuart was a family man who played an active role in raising and parenting his then college-aged children. Further like Scott, Mr. Stuart's friends and family wrote the Court to attest to his good character and affirm that he otherwise had a positive impact on his community. But more like Mr. Parigian, Mr. Stuart sought to take advantage of a market he perceived as less regulated and therefore more vulnerable: the microcap market. Nevertheless, this Court sentenced Mr. Stuart to 16 months of probation, which began with two months of community confinement followed by 6 months of home confinement.

Scott's case presents as a close comparison to Mr. Parigian's and Mr. Stuart's. And just as the Court found in those cases, a sentence here of supervised release with a period of home confinement is sufficient, but not greater than necessary, to achieve the goals of sentencing.

**IV.     CONCLUSION**

For the reasons articulated herein and those to be advanced at the sentencing hearing, Scott respectfully submits that a sentence of one day in custody, deemed served, followed by two years of supervised release with the first six months served in home confinement is fair, just, and sufficient to meet § 3553(a)'s objectives.

ROBERT SCOTT MURRAY

By His Attorneys,

*/s/ Cory S. Flashner*
Cory S. Flashner (BBO # 629205)
John F. Sylvia (BBO # 555581)
Evelyn Limon (BBO #699513)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000
CSFlashner@Mintz.com
JFSylvia@mintz.com
ELimon@mintz.com

Dated: October 17, 2024

## <u>CERTIFICATE OF SERVICE</u>

I, Cory S. Flashner, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), as well as U.S. Probation Officer Kaileen Paiva by electronic mail, on October 17, 2024.

<u>*/s/ Cory S. Flashner*</u>
Cory S. Flashner

## **APPENDIX**

| Exhibit No. | Document |
|---|---|
| A | Letter from Jacques-Paul T. Barbour, M.Ed., LMHC |
| B | Letter of Support from Michael Winter |
| C | Letter of Support from Darren Telfer |
| D | Letter of Support from David Bonnema |
| E | Letter of Support from Tim & Helen Wright |
| F | Letter of Support from Lorie King |
| G | Letter of Support from Gillian Hsieh |
| H | Letter of Support from Tim Adams |
| I | Letter of Support from Jeffrey Bishop |
| J | LinkedIn Recommendations |
| K | Letter of Support from Daniel Beck |
| L | Letter of Support from Sheila Flaherty |
| M | Letter of Support from Mikel Peesker |
| N | Letter of Support from Geoff Harris |
| O | Letter from Richard Dupee, M.D. |
| P | Letter of Support from Jamie Regan |
| Q | Expert Report of Jimmy S. Pappas |
| R | Letter from Douglas Theobald, CPA |
| S | Letter of Support from Jeffrey Ball |
| T | Letter of Support from Karen Falcone |
| U | Letter of Support from Paul Joubert |
| V | Letter of Support from Thalia Logan |
| W | Letter of Support from Rosanna Miller |
| X | Letter of Support from Stephen Miller |
| Y | Letter of Support from Paul Nelson |
| Z | Letter of Support from Marian Oost-Lievense |
| AA | Letter of Support from David & Sally Patrick |
| AB | Letter of Support from Zhao, Rose |